An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-627

Filed 3 June 2026

Iredell County, Nos. 24JA000016-480, 24JA000017-480

IN THE MATTER OF: M.K., J.K.

Appeal by respondent-mother from order entered 3 February 2025 by Judge Thomas R. Young in Iredell County District Court. Heard in the Court of Appeals 27 January 2026.

> *Lauren Vaughan for petitioner-appellee Iredell County Department of Social Services.*
>
> *Matthew D. Wunsche for appellee Guardian ad Litem.*
>
> *Hooks Law, P.C., by Laura G. Hooks, for respondent-appellant mother.*

FREEMAN, Judge.

Respondent-mother appeals from the trial court's permanency planning order ceasing reunification efforts. On appeal, respondent-mother contends that the trial court failed to make findings of fact that were sufficient to cease reunification efforts or were specific to her. Respondent-mother challenges various findings of fact. After careful review, we affirm the trial court's order.

## I. Factual and Procedural Background

Respondent-parents are the biological parents of M.K. ("Miranda") and J.K. ("Jax").[1] On 5 October 2023, the Iredell County Department of Social Services ("DSS") received a report alleging "abuse and neglect" by respondent-parents. On that day, while pregnant with Miranda, respondent-mother overdosed at a car wash while two-year-old Jax was present. Respondent-father was on a video call with respondent-mother when she started seizing. Respondent-mother began substance abuse treatment but did not consistently participate as recommended. Respondent-mother was diagnosed with opioid, cannabis, and nicotine dependence.

On 13 October 2023, respondent-father was arrested for an outstanding warrant. Jax was placed with a temporary safety provider until respondent-father was released from custody on 3 November 2023. Jax was returned to respondent-parents, and respondent-father agreed not to leave the children unsupervised with respondent-mother. Miranda was born on 13 November 2023.

On 26 January 2024, DSS received another report alleging neglect due to injurious environment. The report indicated that there were firearms in the family residence and that respondent-father was making firearms and hiding them in the woods. There were also concerns about substance use in the home. Due to the possible presence of firearms, law enforcement met with the respondent-parents that

---

[1] Pseudonyms are used to protect the identities of the children. N.C. R. App. P. 42(b).

same day and did not find any in the home. Respondent-mother agreed to meet with DSS on 29 January but did not come to the meeting.

On 29 January 2024, respondent-father went to the DSS office and stated that he would no longer cooperate with DSS. DSS attempted a home visit on 31 January 2024, but respondent-father refused to allow DSS to access the children and respondent-mother. On 2 February 2024, DSS filed petitions alleging that the children were neglected juveniles. DSS was primarily concerned with respondent-mother's "extensive substance abuse history" and respondent-father's "extensive criminal history."

The adjudication and dispositional hearings were held on 9 April 2024. In a written order entered the same day, the trial court adjudicated the children neglected and ordered that the respondent-parents enter into a case plan, comply with DSS and the Guardian ad Litem ("GAL"), submit to random alcohol and drug screenings, not possess alcohol or illegal controlled substances, take DSS-approved parenting classes, and maintain stable housing and income. Respondent-mother specifically was ordered to follow recommendations from substance abuse and mental health providers. Custody of the children remained with respondent-parents, and the trial court ordered respondent-father to "supervise" respondent-mother "at all times" while with the children.

In the summer of 2024, respondent-mother had been meeting weekly with the social worker and engaged in some substance abuse and mental health treatment.

However, respondent-mother had not received substance abuse treatment since around 31 May 2024 and missed treatment for three consecutive weeks in June. Respondent-mother tested positive at several drug screens in April, May, and June.

On 20 August 2024, DSS received a new report alleging neglect stemming from an incident at the family residence on 15 August 2024. On that day,

> [l]aw enforcement responded to the home due to assault. The Respondent Father woke up from the minor child, [Miranda], crying and started yelling at the Respondent Mother and punching her in the left side, telling her that it was her fault that the baby was crying because she did not make the bottle fast enough. The Respondent Father told the Respondent Mother to leave the [residence] and to leave the baby inside. The Respondent Mother could hear the baby crying and, therefore, went back inside . . . and attempted to take the baby so she would not bother the Respondent Father with her crying. The Respondent Father grabbed pepper spray and threatened to spray the Respondent Mother if she did not put down the baby and leave. The Respondent Father was heard yelling at the baby, "If you are going to keep crying, you are going to sit in the floor and cry." The Respondent Mother put down the baby in an attempt to avoid a confrontation and walked outside. When she attempted to leave, the Respondent Father threw a tablet at the Respondent Mother's head causing it to bleed.

Respondent-father was arrested for misdemeanor domestic violence and assault on a female.[2] Respondent-mother obtained a domestic violence protective order but subsequently dismissed the order. Respondent-father was released from

---

[2] At the 28 January 2025 permanency planning hearing, respondent-father had not been convicted of those charges and denied the allegations.

custody but then re-arrested for "violating the no-contact condition of his bond."

On 29 August 2024, respondent-mother entered into a temporary safety plan and agreed to temporarily place the children in DSS custody. Later that day, however, respondent-mother took the children from the temporary placement and their whereabouts were unknown. On 30 August 2024, the trial court granted DSS nonsecure custody of the children.

The first permanency planning hearing occurred on 4 September 2024. The trial court ordered respondent-mother to comply with "the terms of a case plan" and prior dispositional orders, submit to a domestic violence assessment and follow recommendations from that assessment, and re-engage with substance abuse and mental health treatment. The trial court made reunification the primary plan and custody the secondary plan. The trial court awarded respondent-mother two hours of supervised visitation per week. Respondent-mother subsequently was accepted to a residential substance abuse program but was unable to pay the admission fee.

The respondent-parents had repeatedly violated the no-contact order that had been put in place after respondent-father was arrested, and the order was lifted on 15 October 2024 at respondent-mother's request. Respondent-father had "been observed demonstrating controlling behaviors towards [respondent-mother] in not allowing her to meet with the social worker and demanding she not enter into a case plan without him."

DSS reported that the children were having issues in foster care. Jax was

"observed to have aggressive behavioral issues" and was reported to have speech delays. Both children had "numerous sick appointments" since entering into DSS custody. Miranda had several ear infections requiring antibiotic treatment. A doctor recommended that she receive surgical procedures to alleviate her recurring ear infections. Jax also experienced recurring ear infections and his tonsils were enlarged, causing him to experience breathing problems. Jax had been prescribed six rounds of antibiotics. On 8 November 2024, Jax was taken to an emergency room due to the pain and inflammation of his tonsils, which had prevented him from eating or drinking anything for over twenty-four hours. In November 2024, a doctor recommended that Jax undergo surgical procedures to remove his tonsils and alleviate his recurring ear infections. The respondent-parents initially consented to the procedures recommended for Jax but revoked their consent on 12 November 2024. Respondent-parents maintained that the children being moved to another placement "would resolve all of the minor children's medical and behavioral issues and surgery would not be necessary."

In a report filed 22 January 2025, DSS maintained that respondent-mother had not yet entered into a case plan, had missed several requested drug screens, had not provided any information about engaging in substance abuse treatment, and continued to have a relationship with respondent-father.

On 28 January 2025, the second permanency planning hearing took place. As of the date of the hearing, Jax was three years old and Miranda was one year old. At

the hearing, a social worker testified that the children were doing well in their placement other than their ongoing illnesses. Miranda had been treated with more antibiotics to address her "consistent illnesses." Jax continued to have health issues caused by his tonsils. The social worker testified that the respondent-parents were "adamant that the minor children were not sick previous to coming into care . . . and that just a change in environment would fix all of their health issues." The social worker testified that respondent-mother specifically was upset that Jax "had been stopping breathing due to issues with his tonsils" but still would not consent to the recommended surgery.

Respondent-mother had attended two case review meetings but had not entered into a case plan with DSS. The social worker testified that to her knowledge, respondent-mother had not received mental health therapies or a domestic violence assessment. Further, respondent-mother had declined to do five requested random drug screens in September and November 2024. Respondent-mother completed a drug screen on 25 November, the result of which was positive.

The social worker testified that the respondent-parents visited the children separately but specifically testified about one instance where the respondent-parents both "became escalated and were speaking over people and being disrespectful, and at that point in time, security escorted them out." The social worker testified that respondent-mother's visitation "sometimes" went "pretty well," but on occasion respondent-mother would "appear to get really frustrated with some of the redirection

going on in [the] room and being flustered."

DSS was concerned that respondent-mother had appeared under the influence during some visits with the children. The social worker testified specifically about one visit where there was a "pretty distinct outline" of a hand bruised into respondent-mother's upper arm. At this visit, respondent-mother "appeared to be significantly impaired. Her eyes were rolling back in her head. She was speaking in different voices. She[ ] slumped against the wall." As respondent-mother slid down the wall, she moved her arm and Jax's "face bounced off the wall. She was then sitting in a chair and appeared to be unconscious." DSS ended the visit because of "concerns that she was under the influence and that was part of what she was cursing and speaking loudly about was that she had not used any substances and she was not impaired." DSS later asked respondent-mother about the bruising but the conversation was "shut down pretty quickly."

The social worker further testified that respondent-mother sometimes had issues following directions about the children's medical concerns. The social worker confirmed that the children needed to have their recommended surgeries, as the doctors had "stated all of the risks to not having the procedure, including possible permanent hearing damage."

At the hearing, respondent-mother's attorney informed the trial court that she consented to the children having the recommended surgeries.

In its written order entered 3 February 2025, the trial court ordered that DSS

have custody of the children; relieved DSS of reunification efforts; and made guardianship or custody the primary plan and termination of parental rights and adoption the secondary plans. The trial court suspended visitation and ordered that the children have the surgeries recommended by their doctors.

Respondent-mother timely appealed.

## II.     Jurisdiction

This Court has jurisdiction to review "[a]ny order, other than a nonsecure custody order, that changes legal custody of a juvenile." N.C.G.S. § 7B-1001(a)(4) (2025). Accordingly, we have jurisdiction to review the trial court's permanency planning order.

## III.     Standard of Review

"This Court's review of a permanency planning order is limited to whether there is competent evidence in the record to support the findings and whether the findings support the conclusions of law." *In re P.O.*, 207 N.C. App. 35, 41 (2010). "Competent evidence is evidence that a reasonable mind might accept as adequate to support the finding." *In re J.M.*, 384 N.C. 584, 591 (2023) (citation omitted). "The trial court's findings of fact are conclusive on appeal if unchallenged or if supported by competent evidence in the record." *In re I.K.*, 377 N.C. 417, 422 (2021) (cleaned up). We review the trial court's conclusions of law de novo. *In re P.O.*, 207 N.C. App. at 41. "The decision of the trial court regarding best interests of a juvenile is within the trial court's discretion and will not be overturned absent an abuse of discretion."

*In re L.M.*, 238 N.C. App. 345, 349 (2014).

## IV.    Discussion

Respondent-mother challenges various findings of fact and argues that the trial court did not make adequate findings of fact to cease reunification efforts. Respondent-mother also argues that the trial court's findings of fact were not sufficiently specific to her.  We address each argument in turn.

### A.  Findings of Fact

Respondent-mother first challenges the portion of finding of fact 31 that states "the visits are contentious . . . ."  Respondent-mother maintains that being "tired" or "frustrated" is not contentious and that she had generally had positive interactions with the children during visits.  However, record evidence supports that the visits were contentious.  The social worker testified that respondent-mother would get "flustered" and "really frustrated" when redirected during visitation.  The social worker also testified about a visit where respondent-mother had to be removed by security because she and respondent-father "became escalated and were speaking over people and being disrespectful."  Additionally, the trial court heard testimony about one visit where respondent-mother appeared impaired and was "cursing and speaking loudly" when the visit ended early.  Accordingly, the trial court's finding that the visits were contentious is supported by competent evidence and is binding on appeal.

Next, respondent-mother challenges finding of fact 33, which provides:

> The [c]ourt has considered the current visitation plan and finds that it is inappropriate to meet the needs to assure the children's health and safety. Both parents are actively contentious during and after visits and while [respondent-father] actively engages in the most aggressive behaviors, the Respondent Mother aids and abets the same. . . . [T]he lack of the Respondent Mother having substance abuse treatment and her appearance at visits appearing impaired greatly concern the [c]ourt that visits at the DSS can safely continue.

Respondent-mother maintains that significant negative interactions occurred at only two visits and visitation was otherwise positive. As discussed above, there is competent evidence to support that during visitation respondent-mother had to be removed due to angry, disruptive behavior. Indeed, respondent-mother appeared impaired during one visit, and evidence demonstrates that she had not meaningfully engaged in substance abuse treatment. Accordingly, the trial court's finding that visitation was inappropriate to meet the needs and to assure the children's safety is supported by competent evidence.

Respondent-mother challenges finding of fact 41, which states: "The [c]ourt finds that the minor children require additional assistance beyond that which can be provided by the Respondent Parents." Respondent-mother maintains that she went to medical appointments, spoke with doctors, gave consent for the children's surgeries at the permanency placement hearing, and that there were no other medical issues besides the surgeries. However, both children suffered from recurring medical issues that significantly impacted their health. Medical providers expressed why the

procedures were needed for the health of the children and DSS asked the parents to consent for the children to have the procedures multiple times over several months; however, respondent-mother did not do so until the hearing. Furthermore, several unchallenged findings support that the children needed assistance beyond that which the respondent-parents offered. Factual findings 15 and 16 extensively detail the children's health issues and potential impacts on their health if untreated. Additionally, factual finding 18 states that "the children have continued to require further medical attention for the same issues since the well check in 2024." Accordingly, there is competent evidence and other unchallenged findings of fact to support the finding that the children require assistance beyond that which could be provided by respondent-mother.

Finally, respondent-mother challenges a portion of finding of fact 34.[3] This factual finding generally states that the reunification efforts would be unsuccessful for several reasons including, as relevant here, respondent-mother's "continued impairment." Respondent-mother maintains this portion is unsupported because her most recent positive drug screen occurred two months prior to the hearing, and she

_____

[3] Respondent-mother generally argues that factual findings "34, 37, 41, and 42 are not sufficiently supported and cannot reach a conclusion that reunification would clearly be unsuccessful or inconsistent with Miranda and Jax's health and safety." But beyond the challenges to findings 34 and 41 discussed in this section, respondent-mother does not argue that these findings are unsupported by competent evidence; rather, she generally avers that these findings do not satisfy the statutory requirements set forth in N.C.G.S. § 7B-906.2(d). *See* N.C. R. App. P. 28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned). Accordingly, respondent-mother's challenge to these findings is inadequate for our review as to whether the factual findings are supported by competent evidence.

had sought treatment at the beginning of the case and payment assistance for the residential substance abuse treatment. Accordingly, "it was not yet clear that [she] would not re-engage with and maintain sobriety." However, the trial court received reports and heard testimony that respondent-mother had missed several requested drug screens and had not provided information about engaging in substance abuse treatment. Further, some of the drug screens that respondent-mother had completed were positive. Accordingly, the trial court's factual finding about respondent-mother's "continued impairment" is supported by competent evidence.

## B. Satisfaction of Statutory Requirements

Respondent-mother argues that the trial court did not make sufficient findings to satisfy the requirement to cease reunification efforts as set forth in N.C.G.S. § 7B-906.2(d), and that it did not make factual findings that were specific to her.

### 1. *Statutory Factors*

A trial court may eliminate reunification as a permanent plan if "the court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." N.C.G.S. § 7B-906.2(b) (2025). In making this determination, the trial court must make written findings "which shall demonstrate the degree of success or failure toward reunification[,]" including:

> (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.

(2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.

(3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.

(4) Whether the parent is acting in a manner inconsistent with the health and safety of the juvenile.

N.C.G.S. § 7B-906.2(d) (2025). "[T]he trial court's written findings need not track the statutory language verbatim, but 'they must make clear that the trial court considered the evidence in light of whether reunification would clearly be unsuccessful . . . .'" *In re L.L.*, 386 N.C. 706, 716 (2024) (quoting *In re J.M.*, 384 N.C. 584, 594 (2023)). "[O]nly those factors which demonstrate the degree of success or failure toward reunification require written findings." *Id.*

Regarding the first factor—whether respondent-mother was making adequate progress within a reasonable period of time—the trial court found that respondent-mother "has yet to enter into any significant form of substance abuse treatment"; had a positive drug screen in November 2024; and that respondent-mother "appeared to be impaired" during some visits. The trial court further found that both of the respondent-parents had not entered into a case plan or participated in court-ordered services. Indeed, the trial court's finding about respondent-mother's "continued impairment," supports that she was not progressing with court-ordered substance abuse treatment. Therefore, the trial court made sufficient findings of fact that specifically address respondent-mother's failure to make adequate progress

within a reasonable period.

These findings also support the second factor—whether the parent is actively participating in the case plan. Additionally, the trial court made findings about what respondent-mother had been ordered to do and about her compliance as of the 4 September 2024 permanency planning hearing. The trial court found that, as of the present hearing, respondent-mother had still not entered into a case plan or meaningfully engaged with substance abuse treatment. Accordingly, the trial court made findings of fact to show that respondent-mother was not actively participating in a case plan.

The trial court's findings also address the third factor—whether respondent-mother made herself available to the trial court, DSS, and the GAL. The findings indicate that she did. The trial court found that respondent-mother complied with a requested drug screening. The trial court further found that respondent-mother attended most visits with the children, characterized her behavior at the visits as "actively contentious," and that she "abet[ed]" respondent-father's "aggressive behaviors[.]" The trial court specifically found that respondent-mother had been "giving indications that she would enter into a[n] Out of Home Family Services Treatment Plan" but had not done so. These findings show that respondent-mother was available to the trial court, DSS, and the GAL to satisfy the third statutory factor.

Finally, the trial court made findings of fact to support the last factor— whether respondent-mother acted inconsistently with the health of safety of the

children.  The trial court made findings about her impairment while visiting the children, which shows how her lack of progress in substance abuse treatment affects the health and welfare of the children.  The trial court also made extensive findings about the children's persistent health issues, the necessity of the recommended procedures to treat these issues, and that the children "require additional assistance beyond that which can be provided by the Respondent Parents."  Accordingly, the trial court made sufficient findings of fact to satisfy the fourth statutory factor.

While the trial court's written findings of fact did not track the statutory language verbatim, they nonetheless made it clear that the trial court considered the factors which demonstrate the degree of success or failure toward reunification and are sufficient under the statute to cease reunification efforts with respondent-mother.

## 2. *Findings Specific to Respondent-Mother*

Respondent-mother maintains that because there were "numerous" findings about respondent-father but only two "solely" about respondent-mother, the trial court "substitute[d] findings about [respondent-father] to infer findings specific to [respondent-mother] to reach the same conclusion."

"[F]indings of fact must be sufficiently specific to allow an appellate court to review the decision and test the correctness of the judgment."  *In re O.W.*, 164 N.C. App. 699, 702 (2004) (cleaned up).  "[I]t is not the role of the reviewing court to draw inferences or make ultimate findings on the trial court's behalf."  *In re T.W.*, 250 N.C. App. 68, 76 (2016).

The findings discussed herein are about respondent-mother's conduct during the pendency of the case. Though some of the findings also detail respondent-father's conduct or respondent-mother's interactions with respondent-father, they are still specific to respondent-mother's acts and omissions to support the trial court's conclusion without drawing inferences. Accordingly, the trial court made adequate findings of fact to support its conclusion to cease reunification efforts with respondent-mother.

## V.    Conclusion

The trial court made findings of fact that are sufficient under N.C.G.S. § 7B-906.2(d) to support ceasing reunification efforts, and those findings are specific to respondent-mother. The challenged findings of fact are supported by competent evidence. Therefore, we affirm the trial court's permanency planning order.

AFFIRMED.

Judges STROUD and STADING concur.

Report per Rule 30(e).